Leave to File Granted Judge C. Kollar-Kotelly 3/30/2017

**U.S. DISTRICT COURT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JULIE BEBERMAN,<br>Plaintiff,<br>v.<br>SECRETARY OF STATE REX TILLERSON, IN HIS OFFICIAL CAPACITY,<br>Defendant. | CIVIL. NO. 16-02361 CKK<br>ACTION FOR BACK PAY,<br>INJUNCTIVE RELIEF,<br>AND DAMAGES<br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Julie Beberman, pro se, and files her First Amended Complaint against Defendant Secretary of State Rex Tillerson pursuant to Federal Rules of Civil Procedure 15(a)(1)(B) which allows amendment as a matter of course within 21 days after service of a responsive pleading or a motion under Rule 12(b), (e), or (f), whichever is earlier. For her First Amended Complaint Beberman alleges, upon information and belief, as follows:

### SUMMARY OF THE CLAIMS

1. Plaintiff Julie Beberman brings this action for damages, back pay, injunctive relief, and for such other relief as is just and proper, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, for discrimination against her based on gender and for retaliation against her for her prior activities protected under Title VII, and pursuant to the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 633a, for retaliation against her for her prior activities protected under the ADEA. She has exhausted her administrative remedies and seeks a jury trial on all causes of action that may be tried to a jury.

RECEIVED
Mail Room
MAR 28 2017
Clerk of Court
District of Columbia

## THE PARTIES

2. Plaintiff Julie Beberman is a citizen of the United States, is domiciled in the United States Virgin Islands, and is employed by the U.S. Department of State [hereinafter "the State Department"] as a Foreign Service Officer (FSO).
3. Defendant Secretary of State Rex Tillerson, who is sued only in his official capacity, is the proper defendant for Title VII and ADEA causes of action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 2000e-16(c) and 2000e-5(f)(3), 29 U.S.C. § 633a(c), and 28 U.S.C. § 1331.
5. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(e)(1).

## EXHAUSTION OF ADMINISTRATIVE REMEDY

6. Beberman sought counseling within 45 days of the date that the facts which would support her cause of action regarding gender-based discrimination at Embassy Caracas were apparent to her, or would have been apparent to a reasonably prudent person.
7. Beberman filed a timely formal complaint for discrimination with the State Department's Office of Civil Rights (OCR).
8. OCR accepted for investigation the following alleged discriminatory acts for investigation:

   a. Denial of the opportunity to rotate into the Immigrant Visa (IV) section;

   b. Denial of the opportunity to rotate into the Fraud Prevention Unit (FPU);

   c. Denial of access to the computer network;

   d. November 30, 2012 curtailment from Post; and

   e. Management scrutinization of Beberman's work more than the work of her colleagues.
9. On April 9, 2014, OCR provided Beberman with the Report of Investigation.

10. On May 12, 2014, Beberman alleged violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633 in her First Amended Complaint in the U.S. District Court of the Virgin Islands, Civil No. 2014-20.

11. On May 29, 2014, Beberman submitted a hearing request for her Title VII claims only.

12. On January 11, 2017, the Administrative Judge dismissed Beberman's hearing request because she found that the factual allegations at issue in the District Court and the administrative complaint were identical.

13. The Administrative Judge dismissed Beberman's hearing request under her 29 C.F.R. § 1614.109(b) authority to dismiss complaints pursuant to 29 C.F.R. § 1614.107.

14. When an administrative judge has issued a decision under 29 C.F.R. § 1614.109(b), "the agency shall take final action on the complaint by issuing a final order within 40 days of receipt of the hearing file and the administrative judge's decision." 29 C.F.R. § 1614.110.

15. "The final order shall notify the complainant whether or not the agency will fully implement the decision of the administrative judge and shall contain notice of the complainant's right to appeal to the Equal Employment Opportunity Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits." 29 C.F.R. § 1614.110.

16. On March 20, 2017, Beberman contacted OCR regarding the issuance of a final order.

17. OCR Chief Glenn Budd informed Beberman that OCR would not be issuing a final order.

18. According to 29 C.F.R. § 1614.109(i), "[i]f an agency does not issue a final order within 40 days of receipt of the administrative judge's decision in accordance with 1614.110, then the decision of the administrative judge shall become the final action of the agency."

19. Pursuant to 29 C.F.R. § 1614.107(a), Beberman has 90 days from receipt of such final action to file a Title VII complaint in an appropriate U.S. District Court.

20. Beberman filed a timely formal complaint for retaliation and reprisal with OCR after she was terminated as an EEO Counselor.

21. OCR accepted the following alleged discriminatory act for investigation:

> Whether the U.S. Department of State discriminated against Complainant, a Foreign Services Officer, on the basis of reprisal (prior EEO activity) when on June 24, 2014, Complainant was issued correspondence from the Chief, Office of Civil Rights, Intake and Resolution Division, removing Complainant from the EEO Counselor program.

22. OCR then issued a decision finding that Beberman had not proven her claims.

23. Beberman timely appealed OCR's decision to EEOC's Office of Federal Operations which issued its decision on October 14, 2016 and informed Beberman that she had 90 days to file in district court.

24. Beberman filed this action within the 90-day filing period.

25. Beberman filed a timely formal complaint with OCR regarding her tenure denial on August 9, 2016.

26. On September 13, 2016, OCR accepted for investigation the following allegations:

> Because of your race (Caucasian), color (light), national origin (Caucasian-American), age (DOB: 04/1962), sex (female and sexual orientation), disability (physical), and as acts of reprisal for prior protected activity, you were discriminated against when:
>
> 1. On February 26, 2016, your tenure was denied; and
>
> 2. On March 31, 2016, you received separation orders to depart Embassy Malabo prior to completing your assigned tour.

27. The Report of Investigation has not yet been issued, which would trigger the time for filing a civil action or proceeding toward an administrative decision.

## ALLEGATIONS

28. Beberman is a woman and over the age of 40.

29. Beberman, an FSO, was employed by the State Department during the relevant period and continues in the State Department's employ.

30. Beberman was appointed to a limited career appointment that would expire if she were not granted tenure within five years of obtaining such appointment.

31. After she completed the six-week Basic Consular Course with a perfect score, the State Department commissioned Beberman as a Consular Officer and posted her to serve her first assignment as an FSO at Embassy Caracas in Venezuela, beginning on or about October 1, 2011.

32. Beberman was assigned to the non-immigrant visa unit for her first year at Embassy Caracas.

33. During the course of that first year, Beberman was also assigned responsibility for the SharePoint portfolio.

34. From the time that Beberman began adjudicating non-immigrant visas at Embassy Caracas, she had a lower than average refusal rate resulting from her application of section 214(b) of the Immigration and Nationality Act, 8 U.S.C. § 1184(b).

35. Beberman's initial rater counseled her on her lower than average refusal rate, because he was concerned that her lower than average refusal rate would increase the overstay rate for Venezuelans and because his objective was to have a uniform refusal rate within the consular section.

36. Beberman demonstrated to her initial rater that her lower than average refusal rate had not resulted in a higher overstay rate and that she was adjudicating visas in compliance with 214(b) of the Immigration and Nationality Act.

37. Neither Beberman's initial rater nor her reviewer mentioned her lower than average refusal rate in her Employee Evaluation Report (EER) for the nine-month period covering October 1, 2011 to July 6, 2012, leading her to believe that her refusal rate was no longer of concern.

38. Beberman received a Franklin Award for her contributions to the team that reduced Embassy Caracas visa wait time.

39. Visa Chief Eric Cohan became Beberman's rater on July 26, 2012.

40. Cohan ended Beberman's SharePoint portfolio assignment, notwithstanding her request to continue with that portfolio assignment, and told her that he was against SharePoint and that the consular section should not have a SharePoint site.

41. Cohan made remarks to her about her engineering background that were demeaning, humiliating, and inappropriate, and intended to belittle her for being a female engineer.

42. Cohan publicly ridiculed her in front of male employees from other federal agencies when she asked to consult with him concerning a non-immigrant visa application.

43. Cohan publicly humiliated her in front of the consular section when she asked her fellow consular officers to gather information to share with the Department of Homeland Security (DHS) regarding Venezuelan-European dual citizens who had sought entry under the Visa Waiver Program and who DHS apparently had improperly denied entry, after Cohan had privately approved of her conducting this interagency effort.

44. Cohan counseled Beberman about her low refusal rate on or about September 7, 2012 and asked her to concede that she had given more visas to applicants who would overstay their visas than had the consular officers with higher refusal rates; Beberman would not concede this absent any proof.

45. Cohan also questioned Beberman about her issuance of a visa in a case in which DHS had entered an erroneous comment. Beberman repeated the comprehensive explanation that she had given the Deputy Visa Chief several weeks earlier.

46. All Consular Officers are required to comply with Visa Lookout Accountability (VLA) requirements.

47. From the time that Beberman began work at Embassy Caracas until October 2, 2012, consular management never informed her of any non-conformance with the VLA requirements or any potential VLA violations.

48. Subsequent to the September 7, 2012 counseling session, Cohan subjected Beberman's past adjudications to heightened scrutiny to search for VLA violations and other reasons to challenge her adjudicative decisions.

49. Cohan did not subject any other consular officers' adjudications to such scrutiny.

50. Beberman took annual leave beginning on or about September 13, 2012 and returned to work on October 1, 2012.

51. During the period that Beberman was on annual leave, Cohan disabled all of her access to the consular systems and did not re-enable her access upon her return to work on October 1, 2012.

52. Beberman had been scheduled to begin a rotation in the immigrant visa unit and fraud prevention unit on October 1, 2012.

53. On October 1, 2012, the day that Beberman had been scheduled to begin an immigrant visa unit and fraud prevention unit rotation, she was not permitted to begin either rotation or continue adjudicating non-immigrant visas.

54. On October 2, 2012, Cohan told Beberman, for the first time, that he believed that she had committed several potential VLA violations, even though he lacked any evidence to show that any of the individuals to whom Beberman had issued visas were the same people identified on the consular systems database.

55. On October 2, 2012, Cohan told Beberman, for the first time, that she was required to include a special comment, such as "prior refusal noted," when she issued a visa to an applicant who had previously applied for a visa and been denied.

56. After Cohan disabled her access to the consular systems, Cohan did not assign Beberman any work.

57. Beberman asked to assist with taking biometric data and Cohan refused, even though entering biometric data would not have involved any exercise of her discretion.

58. Not being allowed to adjudicate visas or even to enter biometric data was humiliating and demeaning and presented the appearance to others in the consular section that Beberman had committed malfeasance or some other impropriety.

59. At Cohan's insistence, in November 2012, Embassy Caracas sought and was granted curtailment of Beberman's two-year assignment there.

60. Cohan gave the male consular officer who had the next lower non-immigrant visa refusal rate, the immigrant visa unit and fraud prevention unit rotations that Beberman had been scheduled to perform.

61. On information and belief, Cohan assigned male consular officers to work on the SharePoint site, after having informed Beberman that he was adamantly opposed to SharePoint.

62. Cohan then subjected the adjudications of another woman, known to associate with Beberman, to heightened scrutiny.

63. At the end of November or beginning of December 2012, Defendant cancelled Beberman's assignment to Embassy Port of Prince, Haiti, which she had been designated to serve after completing her assignment at Embassy Caracas.

64. Instead, Defendant assigned Beberman to a two-year position in the Bureau of African Affairs (AF).

65. AF chose Beberman to serve as an EEO Counselor on April 10, 2013.

66. She fulfilled the prerequisites to serve as an EEO Counselor, including a week-long training session, and OCR informed her that she was certified as an EEO Counselor on June 19, 2013.

67. On November 6, 2013, she was assigned her first EEO case to counsel.

68. As an EEO Counselor, Beberman's duties in accordance with 29 C.F.R. § 1614 and Management Directive 110 were as follows:

> 1. Advise individuals about the EEO complaint process, including the Alternative Dispute Resolution (ADR) program;
>
> 2. Gather information about the complaint;
>
> 3. Define the claim/s and basis/es of the complaint;
>
> 4. Conduct a limited inquiry;
>
> 5. Attempt resolution of the complaint at the lowest level possible;
>
> 6. Conclude the counseling process if resolution is not achieved and issue the "Notice of the Right to File a Discrimination Complaint"
>
> 7. Memorialize EEO counseling activities in an EEO Counselor's Report

69. In the course of performing her duties as an EEO Counselor, she told a Responsible Management Official (RMO) that she had previously prevailed in an EEO matter.

70. On or about the week of June 9, 2014, Glenn Budd, OCR's Chief of Intake and Resolution called Beberman without advance notice. Wendy Herring, who worked with Budd, joined the call.

71. Budd asked Beberman whether she had disclosed her prior EEO activity to the RMO and Beberman answered affirmatively.

72. Budd accused Beberman of being biased against the State Department and told her that he would be sending her a letter terminating her as an EEO Counselor.

73. On June 24, 2014, Budd wrote Beberman the following letter:

> Dear Julie Beberman,
>
> The Office of Civil Rights would like to thank you for your work as an EEO Counselor. This is a challenging yet vital role within the Department. However, we regret to inform you that we no longer require your services at this time and must immediately remove you from the EEO Counselor Program.
>
> We appreciate all you have done for the Department and are grateful for your assistance and willingness to conduct EEO counseling on behalf of the Office of Civil Rights. If you have any questions, please do not hesitate to contact us.
>
> Sincerely,
>
> Glenn C. Budd
> Chief, Intake and Resolution

74. At the time that OCR terminated Beberman, it was aware of Beberman's extensive prior EEO activity.

75. Beberman was performing her duties as an EEO Counselor in a neutral manner.

## COUNT 1 - AGAINST SECRETARY OF STATE REX TILLERSON FOR SEX DISCRIMINATION IN VIOLATION OF TITLE VII AND THE ADEA

76. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

77. When Beberman was posted to Embassy Caracas and served as a Vice Consul, Visa Chief Eric Cohan was her supervisor and rater and Consul General Dale Rumbarger was her reviewer.

78. Cohan treated Beberman differently based on her gender when he demeaned and humiliated her in front of the consular section and interagency employees.

79. Cohan treated Beberman differently based on her gender when he was unwilling to consider and discuss the reasons for her application of section 214(b) of the Immigration and Nationality Act differing from that of other consular officers, and, instead, took action and caused others to take action against her when she was unwilling to conform to the average rate, just for the sake of conformance.

80. Beberman served in the Non-Immigrant Visa Unit and had been scheduled to rotate into the Immigrant Visa Unit and the Fraud Prevention Unit.

81. Cohan treated Beberman differently because of her gender when, on the day that she was scheduled to begin the Immigrant Visa rotation, he did not allow her to do so, and instead gave the duty to one of Beberman's male colleagues.

82. Cohan also treated Beberman differently because of her gender when he did not allow her to perform her previously assigned rotation in the Fraud Prevention Unit and instead assigned the same man to the Fraud Prevention Unit.

83. Cohan also treated Beberman differently when, after observing that Beberman and her male colleague both had low non-immigrant visa refusal rates, he removed both she and her male

colleague from adjudicating non-immigrant visas, and then assigned her immigrant visa and fraud prevention unit rotations to her male colleague to advance his career and had her curtailed.

84. Cohan also treated Beberman differently because of her gender when he applied undue and procedurally defective scrutiny to her visa adjudication history, with the intent of finding an error that he could use to justify taking, and having others take, action against her.

85. Cohan also treated Beberman differently because of her gender when, without any warning, he summarily denied her continued access to the consular system computer network.

86. Cohan treated Beberman differently because of her gender when he refused to give her any new assignment for two months, knowing that this would lead the consular section to believe that she had committed some impropriety or act of malfeasance.

87. Cohan also treated Beberman differently when he held a meeting with the consular section at which Beberman was not present and gave pretextual reasons for denying Beberman's access to the consular system computer network.

88. Cohan also treated Beberman differently because of her gender when, through post management officials whom he influenced, he caused Embassy Caracas to seek Beberman's curtailment.

89. Consul General Dale Rumbarger treated Beberman differently because of her gender when he supported Cohan with regard to all the actions that he took against Beberman, including claiming that Cohan had never specially scrutinized Beberman's adjudications.

90. Cohan's actions were part of a pattern and practice of ongoing discrimination and constituted a violation of Title VII.

91. The gender discrimination described above was done intentionally, willfully, maliciously, and with a reckless disregard for Beberman's rights under federal law.

92. As a direct and proximate result of said discrimination, Beberman has suffered and continues to suffer mental anguish, distress, humiliation, great expense, and loss of enjoyment of life.

**COUNT 2 - AGAINST SECRETARY OF STATE REX TILLERSON FOR RETALIATION IN VIOLATION OF TITLE VII AND THE A**

93. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

94. Budd terminated Beberman's collateral duty as EEO Counselor in retaliation for her engaging in protected EEO activity.

95. But for her prior EEO activity, OCR would not have terminated Beberman as a collateral duty EEO Counselor.

96. Beberman's termination as a collateral duty EEO Counselor constitutes an adverse action.

97. Retaliatory termination as an EEO Counselor would deter a reasonable employee from engaging in protected EEO activity.

98. FSOs are evaluated on their support of EEO principles.

99. In Beberman's evaluations when she served as an EEO Counselor, her superiors praised her for her role as an EEO Counselor.

100. By removing Beberman's collateral duty as an EEO Counselor, OCR harmed her by eliminating this beneficial consideration from her future evaluations.

101. The Department currently requires EEO Counselors to agree to serve for a minimum of four years.

102. Beberman was expected to serve as EEO Counselor in her onward assignment in Embassy Malabo, Equatorial Guinea, beginning December 2014. Embassy Malabo's Deputy

Chief of Mission expressed to Beberman that she was displeased that Beberman could not serve as EEO Counselor.

103. Beberman's termination as EEO Counselor caused her Embassy Malabo superiors to be concerned about her performance in advance of her even reporting to duty.

104. The Secretary retaliated against Beberman for engaging in Title VII and ADEA protected activities.

105. Evidence of the Secretary's retaliatory animus includes OCR sending a Report of Investigation (ROI) to Beberman's former address and failing to take steps to correct this error when Beberman discovered it. OCR showed its retaliatory animus by refusing to correct this error even though it recognized that the issuance of the ROI triggered certain time-sensitive rights and that Beberman could not exercise those rights because she had not received the ROI, due to OCR's error.

106. Further evidence of the Secretary's retaliatory animus includes OCR's repeated deliberate failure to provide Beberman an opportunity to resolve her concerns at the informal stage, leaving her only the option of filing a formal complaint, contrary to the rules and procedures applying to federal employees.

107. The Secretary's retaliation chilled Beberman's right to freely participate in and speak about her Title VII and ADEA protected activities.

108. The Secretary's retaliation also chilled the rights of other employees who were afraid that they could be persecuted or face reprisal for engaging in or speaking about their Title VII or ADEA protected activities or testifying with regard to Beberman's claims.

109. The Secretary's retaliation has a particularly strong chilling effect because OCR, itself, retaliated against Beberman, notwithstanding its mandate is to uphold civil rights and investigate civil rights violations.

110. OCR, in the conduct of its own operations, serves as a model which the rest of the State Department follows.

111. On January 1, 2014, OCR requested that the EEO Counselors, including Beberman, provide the names of their supervisor so that the OCR Director could recognize their service with a message of appreciation to their supervisors.

112. After Beberman's termination as an EEO Counselor, Beberman's supervisors did not receive any such letters of appreciation from the OCR Director, acknowledging her service as an EEO Counselor, which would have tended to influence them to write an even more positive EER.

113. Once Beberman was terminated as an EEO Counselor, her raters and reviewers could no longer make reference to this collateral duty in her performance evaluations.

114. After her termination as an EEO Counselor, not only did Beberman's EERs not reflect her performance as an EEO Counselor, but the change to her duties permitted the CTB to draw an adverse inference about this change in her duties.

115. The lack of opportunity to reference Beberman's performance as an EEO Counselor in her performance evaluations contributed to and proximately caused the Summer and Winter 2015 Commissioning and Tenure Boards (CTBs), respectively, to defer and deny Beberman tenure.

116. Such tenure denial had adverse consequences for Beberman including that the State Department curtailed her assignment at Embassy Malabo, Equatorial Guinea, 16 months into her three-year assignment, and required her to report to Washington, D.C.

117. Beberman was irreparably harmed by no longer being able to serve as an overseas diplomat.

118. Because Beberman was denied tenure, she was not eligible for promotion.

119. Beberman stopped receiving hardship pay and housing, and was no longer eligible for service needs differential or the student loan repayment program.

120. Beberman has also filed a grievance challenging the composition of the CTBs. If she wins that grievance, she may be reconsidered for tenure by one or more reconstituted CTBs.

121. Beberman filed grievances asking for expungement of two EERs or portions thereof.

122. If the Foreign Service Grievance Board grants Beberman's requests, these unfavorable EERs will be removed from her personnel file and she will likely be reconsidered for tenure by one or more reconstituted CTBs.

123. The absence of a rating and review of her performance as an EEO Collateral Duty Officer, particularly after earlier EERs having noted this duty, will reduce the likelihood of her being granted tenure by a reconstituted CTB.

124. Promotion Boards consider the most recent five years' worth of EERs when considering a candidate for promotion.

125. The lack of evaluation of her role as an EEO Counselor will continue to reduce the likelihood of her being promoted even after she is tenured.

126. The retaliation described above was done intentionally, willfully, maliciously, and with a reckless disregard for Beberman's rights under federal law.

127. As a direct and proximate result of such retaliation, Beberman has suffered and continues to suffer mental anguish, distress, humiliation, great expense, and loss of enjoyment of life.

## JURY DEMAND

Plaintiff Julie Beberman requests that a jury be convened to try all factual issues that may be determined by a jury in this case.

## PRAYER FOR RELIEF

Plaintiff Julie Beberman prays that this Court grant her relief as follows:

a. Require the State Department to extend Beberman's limited career appointment so that she will have further evaluated experience upon which a Commissioning and Tenure Board can make its decision, since one or more previous EERs were influenced by discriminatory animus and one or more EERs did not evaluate her performance as an EEO Counselor because she had been removed from that duty due to retaliatory animus.
b. Direct the Secretary to grant Beberman tenure and promote her retroactively;
c. Award compensatory damages, backpay, and interest including, but not limited to, for;
    (1) Pay and benefits lost as a result of being curtailed from Embassy Caracas;
    (2) Pay and benefits lost as a result of not proceeding to Embassy Port of Prince, Haiti; and
    (3) Pay and benefits lost as a result of being curtailed prematurely from Embassy Malabo;

(4) Pay and benefits lost as a result of not being promoted; and

(5) Emotional distress caused by discriminatory and retaliatory conduct.

d. Award frontpay with benefits;

e. Award attorney's fees and costs, as warranted; and

f. Award such other and further relief as the law allows.

March 24, 2017

Respectfully submitted,

Julie A. Beberman, pro se
P.O. Box 7006
Arlington, VA 22207
bebermanja@state.gov
oilgenie@yahoo.com
(340) 277-1613

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of March 2017, the foregoing First Amended Complaint was served on Defendant via electronic mail to Mark Nebeker at mark.nebeker@usdoj.gov.

Dated: March 24, 2017

Julie A. Beberman, pro se
P.O. Box 7006
Arlington, VA 22207
(340) 277-1613
BebermanJA@state.gov
OilGenie@yahoo.com