**U.S. DISTRICT COURT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JULIE BEBERMAN,<br>Plaintiff, | ) |
| | ) CIVIL. NO. 16-02361 -TJK |
| v. | ) ACTION FOR BACK PAY, |
| SECRETARY OF STATE REX MIKE POMPEO, IN HIS OFFICIAL CAPACITY, | ) INJUNCTIVE RELIEF, |
| Defendant. | ) AND DAMAGES |
| | ) JURY TRIAL DEMANDED |

**THIRD AMENDED COMPLAINT**

COMES NOW Plaintiff Julie Beberman, pro se, and as her Third Amended Complaint against Defendant Secretary of State Rex Mike Pompeo alleges, upon information and belief, as follows:

**SUMMARY OF THE CLAIMS**

1. Plaintiff Julie Beberman brings this action for damages, including back pay, injunctive relief, and compensatory damages, and for such other relief as is just and proper, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, for discrimination against her based on gender (female), gender plus age (female over the age of 40), race (White-Caucasian), sexual orientation (heterosexual), national origin (American) and for retaliation against her for her prior activities protected under Title VII; pursuant to the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 633a, for retaliation against her for her prior activities protected under the ADEA; and for disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. She has exhausted her administrative remedies and seeks a jury trial on all causes of action that may be tried to a jury.

RECEIVED
Mail Room
JUL 25 2019
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

2. In Count 1 Beberman alleges that her Embassy Caracas consular supervisors were motivated by discriminatory animus to give her a negative Employee Evaluation Report (EER) for the period from October 3, 2011 to July 6, 2012, which proximately caused the Winter 2015 Commissioning and Tenure Board (CTB) to deny her tenure.
3. In Count 2 Beberman alleges that her Embassy Caracas consular supervisors were motivated by discriminatory animus to give her a negative EER for the period from July 26, 2012 to November 7, 2012, which proximately caused the Winter 2015 CTB to deny her tenure.
4. In Count 3 Beberman alleges that Embassy Caracas consular management's discriminatory animus proximately caused the Visa Office to further discriminate against Beberman by first finding and then affirming that she had issued Visa Lookout Accountability (VLA) violations, which proximately caused the Winter 2015 CTB to deny her tenure.
5. In Count 4 Beberman alleges that the Office of Civil Rights retaliated against her for her prior EEO activities by terminating her as an EEO Counselor, which was an adverse action causing her damages and which proximately caused the Winter 2015 CTB to deny her tenure.
6. In Count 5 Beberman alleges that the retaliatory animus of the State Department's mediation representative and the discriminatory animus of Embassy Caracas' consular management and the Visa Office caused her to be denied the opportunity to serve as backup consular officer at Embassy Malabo which proximately caused the Winter 2015 CTB to deny her tenure.
7. In Count 6 Beberman alleges that Embassy Caracas consular management's and the Visa Office's discriminatory animus proximately caused Consular Affairs to provide negative comments to Embassy Malabo's Ambassador, who took such comments into account, as well as further retaliated against Beberman for her EEO activities, in declining to request that Beberman remain at Embassy Malabo after she was denied tenure.

8. In Count 7 Beberman alleges the Secretary discriminated and retaliated against her by disparately treating a similarly situated male employee who had not engaged in EEO activities in that the male employee was permitted to complete his overseas assignment, was assigned to Washington, and was given a Permanent Change of Station (PCS) Order, while Beberman was required to depart her overseas assignment, was not given a Washington assignment for seven months, and was initially issued a Separation Order, rather than a PCS Order.

9. In Count 8 Beberman alleges the Secretary discriminated against her when Ambassador Furuta-Toy declined to request that Beberman remain at Embassy Malabo after she was denied tenure so that a younger man of Native American origin could take her place to increase his chances of being promoted.

## THE PARTIES

10. Plaintiff Julie Beberman is a citizen of the United States, is domiciled in the United States Virgin Islands, and is employed by the U.S. Department of State [hereinafter "the State Department"] as a Foreign Service Officer.

11. Defendant Secretary of State Mike Pompeo, who is sued only in his official capacity, is the proper defendant for Title VII, ADEA and Rehabilitation Act causes of action.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 2000e-16(c) and 2000e-5(f)(3), 29 U.S.C. § 633a(c), and 28 U.S.C. § 1331.

13. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(e)(1). Beberman's Rehabilitation Act claim is properly brought here because "Rehabilitation Act claims are

subject to the same venue provisions as Title VII claims." Prescott-Harris v. Fanning, 2016 U.S. Dist. LEXIS 171360, *22 (D.D.C. Dec. 12, 2016).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. Beberman sought counseling within 45 days of the date that the facts which would support her cause of action regarding gender-based discrimination at Embassy Caracas were apparent to her, or would have been apparent to a reasonably prudent person.

15. Beberman filed a timely formal complaint for discrimination with the State Department's Office of Civil Rights (OCR).

16. OCR accepted for investigation the following alleged discriminatory acts for investigation:

    a. Denial of the opportunity to rotate into the Immigrant Visa (IV) section;

    b. Denial of the opportunity to rotate into the Fraud Prevention Unit (FPU);

    c. Denial of access to the computer network;

    d. November 30, 2012 curtailment from Post; and

    e. Management scrutinization of Beberman's work more than the work of her colleagues.

17. On April 9, 2014, OCR provided Beberman with the Report of Investigation.

18. On May 12, 2014, Beberman alleged violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633 in her First Amended Complaint in the U.S. District Court of the Virgin Islands, Civil No. 2014-20.

19. On May 29, 2014, Beberman submitted a hearing request for her Title VII claims only.

20. On January 11, 2017, the Administrative Judge dismissed Beberman's hearing request because she found that the factual allegations at issue in the District Court and the administrative complaint were identical.

21. The Administrative Judge dismissed Beberman's hearing request under her 29 C.F.R. § 1614.109(b) authority to dismiss complaints pursuant to 29 C.F.R. § 1614.107.

22. When an administrative judge has issued a decision under 29 C.F.R. § 1614.109(b), "the agency shall take final action on the complaint by issuing a final order within 40 days of receipt of the hearing file and the administrative judge's decision." 29 C.F.R. § 1614.110.

23. "The final order shall notify the complainant whether or not the agency will fully implement the decision of the administrative judge and shall contain notice of the complainant's right to appeal to the Equal Employment Opportunity Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits." 29 C.F.R. § 1614.110.

24. On March 20, 2017, Beberman contacted OCR regarding the issuance of a final order.

25. OCR Chief Glenn Budd informed Beberman that OCR would not be issuing a final order.

26. According to 29 C.F.R. § 1614.109(i), "[i]f an agency does not issue a final order within 40 days of receipt of the administrative judge's decision in accordance with 1614.110, then the decision of the administrative judge shall become the final action of the agency."

27. Pursuant to 29 C.F.R. § 1614.107(a), Beberman has 90 days from receipt of such final action to file a Title VII complaint in an appropriate U.S. District Court.

28. Beberman filed a timely formal complaint for retaliation and reprisal with OCR after she was terminated as an EEO Counselor.

29. OCR accepted the following alleged discriminatory act for investigation:

> Whether the U.S. Department of State discriminated against Complainant, a Foreign Services Officer, on the basis of reprisal (prior EEO activity) when on June 24, 2014, Complainant was issued correspondence from the Chief, Office of Civil Rights, Intake and Resolution Division, removing Complainant from the EEO Counselor program.

30. Beberman timely appealed OCR's adverse decision to EEOC's Office of Federal Operations which issued its decision on October 14, 2016 and informed Beberman that she had 90 days to file in district court.

31. Beberman filed this action within the 90-day filing period.

32. On February 26, 2016, Beberman was notified that she had been denied tenure.

33. Less than 45 days later, on or about March 31, 2016, she contacted the Office of Civil Rights to request informal counseling.

34. On July 27, 2016, Beberman received a Notice of Right to File a Formal Complaint in the Office of Civil Rights.

35. On August 9, 2016, Beberman filed a timely formal complaint with OCR regarding her tenure denial and her transfer from Embassy Malabo to Washington, D.C.

36. On September 13, 2016, OCR accepted for investigation the following allegations:

> Because of your race (Caucasian), color (light), national origin (Caucasian-American), age (DOB: 04/1962), sex (female and sexual orientation), disability (physical), and as acts of reprisal for prior protected activity, you were discriminated against when:
>
> 1. On February 26, 2016, your tenure was denied; and
>
> 2. On March 31, 2016, you received separation orders to depart Embassy Malabo prior to completing your assigned tour.

37. Beberman received the Report of Investigation on April 19, 2017, along with a Notice of Right to File giving her several options including bringing a civil action.

38. Beberman was informed that her transfer to Washington was mandated by SOP D-01.

39. Beberman first learned the true reasons that U.S. Ambassador to Equatorial Guinea Julie Furuta-Toy and Deputy Chief of Mission Petra Zabriskie placed Matt Lamm, a younger man of Native American descent, in the position she had filled at Embassy Malabo through discovery responses she received in FSGB Case No. 2017-030 on September 18, 2018.

40. When Beberman received the discovery responses in FSGB Case No. 2017-030, she found out that Ambassador Furuta-Toy declined to request that she remain at Embassy Malabo so that she could give Lamm her position.

41. Beberman did not initially suspect that Lamm had replaced her because he was serving as the Public Diplomacy Officer at Embassy Malabo and she was not informed that Lamm had been selected to replace her.

42. Beberman knew that her position had been posted on the bid list and had assumed that it would be filled by someone outside the embassy.

43. In emails to Beberman long after she had left Embassy Malabo, Lamm continued to write to her using a signature block showing that he was the Public Diplomacy Officer.

44. The Department misled Beberman concerning the reasons that she was transferred to Washington by telling her it was just due to SOP D-01.

45. She learned from the discovery responses that she was a victim of race and gender discrimination.

46. She sought informal counseling on October 10, 2018, less than 45-days after she discovered that she had been discriminated against based on her race and gender.

47. She received a Notice of Right to File from the Office of Civil Rights on November 5, 2018.

48. She filed her Formal Complaint on November 14, 2018, within 15 days of receiving the Notice of Right to File.

49. The Office of Civil Rights dismissed her Formal Complaint on February 28, 2019.

## GENERAL ALLEGATIONS

50. Beberman is a woman and over the age of 40.

51. Beberman is White, Caucasian, and American.

52. Beberman is disabled in that, given her physical condition, she must use an ergonomic keyboard.

53. Beberman has a perceived disability in that she requested, and used, an ergonomic keyboard due to the pain she experiences using a standard keyboard.

54. Beberman was employed by the State Department during the relevant period and continues in the State Department's employ as a Foreign Service officer.

55. Beberman was appointed to a limited career appointment that would expire if she were not granted tenure within five years of obtaining such appointment.

56. After Beberman completed the six-week Basic Consular Course with a perfect score, the State Department commissioned her as a Consular Officer and posted her to serve her first directed two-year assignment as a Foreign Service officer at Embassy Caracas in Venezuela, beginning on or about October 1, 2011.

57. Beberman was assigned to the non-immigrant visa unit for her first year at Embassy Caracas.

58. Beberman's rater (first level supervisor) at Embassy Caracas, from October 2011 to July 2012, was Deputy Visa Chief Shane Myers and her reviewer (second level supervisor) was Consul General Dale Rumbarger.

59. From July 2012 to November 2012, she had a new rater, Visa Chief Eric Cohan, and her reviewer remained Consul General Dale Rumbarger.

60. Beberman received two Employee Evaluation Reports (EERs) for her work at Embassy Caracas, one for October 3, 2011 to July 6, 2012 and the other for July 26 to November 7, 2012.

61. Beberman had been scheduled to serve her second directed assignment at Embassy Port-au-Prince, Haiti.

62. Instead, her Embassy Caracas assignment was curtailed and she served her second directed assignment in the Bureau of African Affairs (AF), then-Office of Regional Security Affairs, as Deputy African Union and Multilateral Affairs Desk Officer, from December 2012 to December 2014, where she received four EERs, two awards, and two letters of acknowledgment.

63. Beberman successfully bid through the open bidding system and was selected to serve as Political/Economic Officer at Embassy Malabo, Equatorial Guinea, where she served from December 2014 to April 2016, and where she received one EER, two Memoranda of Performance (MOPs), an award, two letters of commendation, and recognition for her contributions to the Human Rights Report.

64. Commissioning and Tenure Boards (CTBs) review the contents of employees' electronic Official Personnel Files (eOPFs) in deciding whether to recommend them for tenure, defer them for further tenure consideration, or deny them tenure.

65. Beberman was informed that the Winter 2015 CTB had decided to deny her tenure on or about February 26, 2016.

66. Beberman's employment as a Foreign Service Officer was set to end at the expiration of her five-year limited career appointment, on or about March 27, 2016.

67. However, the Foreign Service Grievance Board (FSGB) granted Beberman temporary interim relief from termination, while it considered whether to grant her interim relief.

68. Despite being granted temporary interim relief, even though Beberman requested to remain at Embassy Malabo, she was transferred from Embassy Malabo to Washington, D.C. in April 2016 on a Separation Order with no further assignment.

69. In Washington, D.C. Beberman performed meaningful work for the International Health and Biodefense office of the Bureau of Oceans, International Environmental and Scientific Affairs, where she was recognized with an award.

70. In November 2016, Beberman was assigned retroactively to April 2016 to an Overcomplement position in the Bureau of African Affairs where she is currently serving.

**COUNT 1 – FIRST NEGATIVE EMBASSY CARACAS EER BASED ON DISCRIMINATORY ANIMUS PROXIMATELY CAUSING TENURE DENIAL**

71. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

72. Myers was biased against and discriminated against Beberman because she was an older White, Caucasian, American, heterosexual female with an actual or perceived disability.

73. Rumbarger was also biased against and discriminated against Beberman as a White, American, Caucasian woman.

74. Myers demonstrated his discriminatory animus by (a) including a discriminatorily motivated Area for Improvement in Beberman's EER; (b) by not reasonably accommodating Beberman's need to use an ergonomic keyboard; (c) by treating her less favorably than a young, male, Asian-American, gay, similarly situated colleague; and (d) by not providing her with the same level of training that he provided to her younger male and female colleagues, all of which proximately caused the Winter 2015 CTB to deny Beberman tenure.

75. Myers and Rumbarger improperly minimalized Beberman's accomplishments in her EER, treating her accomplishments dismissively in her EER as compared to their treatment of the accomplishments of her young, Black, African-American, similarly situated colleague because she was an older, White, Caucasian-American, woman.

76. Myers commented in Beberman's EER for 10-3-2011 to 07-06-2012, as an Area for Improvement, an EER section that must be completed for each employee, as follows:

> During the next rating period Julie should play close attention to the ideas she is intent on communicating and how they are actually being received. She should engage in active listening and be cognizant to the fact that some receiving parties may interpret her direct style and approach as confrontational. For example, in discussions where she has been a participant, her peers have been made uncomfortable at times by her insistence on returning to points already settled. We have discussed this and she is intent on improving this skill.

77. Myers wrote this negative comment because Beberman had raised a legitimate concern about a proposed new rotational duty policy in response to Myers' request for comments about the new policy.

78. Beberman used only appropriate and generally accepted means to communicate her concerns and did so in the proper fora.

79. Myers refused to appropriately address Beberman's concerns at the time because she was female and older than him, and he only valued the opinions of male and younger female employees.

80. Myers never discussed with Beberman his views about her having raised her concerns in any counseling session and failed to provide Beberman with the basis for this Area for Improvement, even when she asked him.

81. Myers' Area for Improvement comment shows that he expected Beberman to guard her silence even when she had concerns and to never rock the boat because she was an older woman.

82. Myers did not similarly criticize older male and younger male and female employees for expressing their concerns.

83. Myers' derogatory Area for Improvement comment demonstrates that he held a bias against Beberman because she was an older women and because she was willing to express her concerns.

84. The Summer 2015 CTB referred to and relied on this Area for Improvement in its statement of the reasons that it had deferred Beberman for future consideration for tenure, making it likely that the Winter 2015 CTB similarly was influenced by this negative Area for Improvement in denying Beberman tenure.

85. Beberman was required to use a keyboard to perform the vast majority of her duties when she worked at Embassy Caracas.

86. She asked to use an ergonomic keyboard to avoid the pain she experienced when she worked using the keyboard that the State Department provided to other employees without a disability, which is not ergonomically designed.

87. Beberman sought a reasonable accommodation from the State Department's disability office to use an ergonomic keyboard.

88. The State Department's disability office refused to provide for an ergonomic keyboard as a reasonable accommodation without a diagnosis.

89. Beberman attempted to obtain a diagnosis from Embassy Caracas' Regional Medical Officer, who sought further information from the disability office, which the disability office failed to

provide, despite the doctor's repeated requests, resulting in the State Department not providing Beberman with either a diagnosis or a recorded reasonable accommodation.

90. Because Embassy Caracas happened to have an ergonomic keyboard available, Julie was allowed to use it.

91. However, Myers refused to accommodate Beberman by allowing to work at the same consular window each day, even though he allowed other consular officers to remain at the same window day after day.

92. Instead, he required her to retrieve the ergonomic keyboard from her desk, detach the non-ergonomic keyboard and attach the ergonomic keyboard in the morning, and detach the ergonomic keyboard and re-attach the non-ergonomic keyboard in the evening and return the ergonomic keyboard to her desk.

93. This caused Beberman to lose valuable visa adjudication time, particularly because to detach and re-attach the keyboards, she had to get on her knees underneath the desk, typically wearing a skirt or dress, and blindly reach around the back of the CPU to find the USB slot, or wait for someone from the information services office, which would take even longer.

94. When Beberman forgot to detach her keyboard at the end of the work day on one occasion, he admonished her, telling her that all work stations had to be left in the "standard" configuration.

95. Because Beberman was required to spend this extra time attaching and re-attaching the keyboard, her visa adjudication rate was lower than it would have been otherwise, which was reflected in her EER.

96. Myers favored a gay, Asian-American, younger man and treated him better than he treated Beberman, even though they were both similarly situated.

97. When the gay, Asian-American, younger man moved to the consular window next to the one in which Beberman was working that day and refused to use the intercom system to communicate with the applicants at his window, but instead, spoke in such a loud voice that the applicants at Beberman's window could not communicate with her, Beberman requested that he either use the intercom or move to another window. He refused and told her that if she did not like it that she could move and communicated to her that he knew that Myers would never ask him to move.

98. When Beberman brought the matter to Myers' attention, just at the young, gay, Asian-American man had anticipated, knowing he was Myers' favorite, Myers directed Beberman to move windows without any discussion, which meant that she had to detach her ergonomic keyboard, re-attach a non-ergonomic keyboard, for the second time that day and repeat that at a different window, causing Beberman to lose even more time adjudicating visas, while Myers' favorite laughed at her.

99. Because he held a discriminatory animus, Myers provided Beberman with less training than her male and younger male and female colleagues, even when she pointed out the discrepancy and sought additional training.

100. In Beberman's EER for October 3, 2011 to July 6, 2012, Myers and Rumbarger dismissed Beberman's accomplishments as non-core and ancillary, but recognized a young, Black, African-American male for similar accomplishments, without terming them non-core or ancillary.

101. Beberman's accomplishments were within the Continuing Responsibilities and Specific Objectives of her Work Requirement Statement.

102. On a project in which Beberman and the young, Black, African-American male worked together, reaching a joint result, Myers and Rumbarger gave the young, Black, African-American male accolades for his role, even giving him credit for Beberman's contributions, but belittled Beberman's work as non-core.

103. Because Myers and Rumbarger improperly considered Beberman's contributions to be non-core and ancillary, they did not recommend her for tenure, but did recommend the young, Black, African-American male for tenure, which influenced the Winter 2015 CTB to deny Beberman tenure.

104. Myers and Rumbarger gave Beberman a less favorable EER than they would have they had not been motivated by a gender, gender plus age, race, national origin, color, sexual orientation, or disability discriminatory animus.

105. This EER proximately caused the Winter 2015 CTB to deny Beberman tenure.

106. Thus, Myers' and Rumbarger's discriminatory animus proximately caused the Winter 2015 CTB to deny Beberman tenure.

107. Tenure denial was an adverse action which caused Beberman to suffer damages detailed below.

**COUNT 2 – SECOND NEGATIVE EMBASSY CARACAS EER BASED ON DISCRIMINATORY ANIMUS PROXIMATELY CAUSING HARM, INCLUDING TENURE DENIAL**

108. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

109. Cohan and Rumbarger discriminated against Beberman based on her gender, gender plus age, race, color, and national origin, by (a) not crediting her explanation as to why her refusal rate was lower than that of her male and younger female colleagues; (b) scrutinizing her visa

adjudications for no legitimate reason; (c) proximately causing the Visa Office to further discriminate against her, as detailed in Count 3; (d) giving her immigrant visa and fraud prevention unit rotations to a younger man; (e) giving her SharePoint portfolio to younger men and women; (f) publicly humiliating her; (g) giving her an extremely negative EER for July 26 to November 7, 2012; and (h) forcing the curtailment of her two-year assignment at Embassy Caracas after only 13 months, all of which proximately caused the Winter 2015 CTB to deny Beberman tenure.

110. From the time that Beberman began adjudicating non-immigrant visas at Embassy Caracas, she had a lower than average refusal rate resulting from her application of section 214(b) of the Immigration and Nationality Act, 8 U.S.C. § 1184(b).

111. Myers' had counseled Beberman on her lower than average refusal rate, because he was concerned that her lower than average refusal rate would increase the overstay rate for Venezuelans and because his objective was to have a uniform refusal rate within the consular section.

112. Beberman demonstrated to Myers that her lower than average refusal rate had not resulted in a higher overstay rate and that she was adjudicating visas in compliance with 214(b) of the Immigration and Nationality Act.

113. Neither Myers nor Rumbarger mentioned her lower than average refusal rate in her EER for the period covering October 1, 2011 to July 6, 2012, leading Beberman to believe that her refusal rate was no longer of concern.

114. In July 2012, Beberman received a Franklin Award for her contributions to the team that reduced Embassy Caracas visa wait time.

115. Notwithstanding, Cohan counseled Beberman about her low refusal rate on or about September 7, 2012 and asked her to concede that she had given more visas to applicants who would overstay their visas than had the consular officers with higher refusal rates.

116. Beberman would not concede that her lower refusal rate had resulted in more overstays than absent any proof and offered to provide the proof that she had given to Myers which showed that she had not given visas to applicants who had overstayed their visas.

117. Cohan treated Beberman differently based on his discriminatory aniumus when he was unwilling to consider and discuss the reasons for her application of section 214(b) of the Immigration and Nationality Act differing from that of other consular officers, and, instead, took action and caused others to take action against her, including the Visa Office, when she was unwilling to conform to the average rate, just for the sake of conformance.

118. Rumbarger, similarly, was unwilling to credit Beberman's explanation for her low refusal rate, writing the following comment in Beberman's EER, which was based on his discriminatory animus:

> After Ms. Beberman's rater had invalidated her consular systems login (an action I supported), I tried to put all this in perspective for her by asking her to compare her judgment to that of her peers, current and past; to that of her direct supervisors; and to mine. She was unyielding, stating that her judgment was equal to or superior to all those, and she continued to defend this point of view in a counseling session with consular management and a representative from HR thereafter.

119. As Beberman's EER reflects, Rumbarger had cornered her with a no win question – She either had to admit that she was wrong and everyone else was right or that she was right and everyone else was wrong. When she tried to respond that each consular officer is expected to exercise his or her best judgment, Rumbarger still insisted she answer the question exactly as he had framed it. She told him that she was confident in her own judgment.

120. Rumbarger refused to consider whether Beberman's visa refusal rate was reasonable given the statistical overstay rates for Venezuelans at that time, but instead insisted that she admit that she was wrong because she was an older woman. He was not willing to even listen to her point of view, but insisted that she had to be wrong because her refusal rate was lower than the refusal rate of her male and younger female colleagues.

121. Rumbarger gave her a negative review because he did not believe that Beberman, as an older woman, should have any confidence in her own judgment.

122. In the counseling session, on or about September 7, 2012, Cohan questioned Beberman about her issuance of a visa in a case in which DHS had entered an erroneous comment. Beberman repeated the comprehensive explanation that she had given the Deputy Visa Chief several weeks earlier.

123. Cohan did not pay attention to her explanation and did not take note that Beberman had referred to a lengthy DHS report included in the case file upon which she told him she had relied, because she was an older woman.

124. Subsequent to the September 7, 2012 counseling session, Cohan subjected Beberman's past adjudications to heightened scrutiny to search for VLA violations and other reasons to challenge her adjudicative decisions, without a legitimate basis to conduct such scrutiny.

125. Cohan did not subject any other male or younger female or Black or African-American consular officers' adjudications to such scrutiny.

126. Cohan treated Beberman differently because of her gender, gender plus age, race, national origin, and color, when he applied undue and procedurally defective scrutiny to her visa adjudication history, with the intent of finding an error that he could use to justify taking, and having others take, action against her.

127. Because Cohan held a discriminatory animus against older woman, Cohan later subjected the adjudications of another older woman, known to associate with Beberman, to heightened scrutiny.

128. Rumbarger made false statements about the reasons that Cohan had scrutinized Beberman's adjudications in an email to the Deputy Assistant Secretary in charge of Conduct, Suitability, and Discipline Marcia Bernicat, because of his discriminatory animus against Beberman, stating untruthfully or mistakenly that Beberman had issued a visa over a "direct hit," when there was no "hit" involved, but rather a comment, which is treated differently than a "hit;" that the visa applicant had overstayed illegally, when she had not; that the subject was ineligible to enter the United States for a fixed period of time which had not elapsed, when, in fact, she was not ineligible to enter the United States and never had been; and that the traveler would have been stopped if she had reached the U.S. border, which is pure speculation and likely untrue, and ended with the conclusion that this issuance justified Cohan's scrutiny.

129. Cohan later admitted that he did not know whether the applicant in question had unlawful presence and that the Visa Office found that Beberman had not committed a violation in issuing the visa.

130. Rumbarger held such a strong discriminatory animus against Beberman that when the grounds for Cohan's scrutiny of Beberman's visa adjudications later came into question, Rumbarger later stated that Cohan had never specially scrutinized Beberman's adjudications.

131. While Beberman was on annual leave from September 12, 2012 to October 1, 2012, Cohan disabled all of her access to the consular systems and did not re-enable her access upon her return to work on October 1, 2012.

132. Cohan treated Beberman differently because of his discriminatory animus when, without any warning, he summarily denied her continued access to the consular system computer network.

133. On October 2, 2012, Cohan told Beberman, for the first time, that he believed that she had committed several potential VLA violations, even though he lacked any evidence to show that any of the individuals to whom Beberman had issued visas were the same people identified on the consular systems database, and referred what he considered to be potential VLA violations to the Visa Office.

134. On October 2, 2012, Cohan also told Beberman, for the first time, that she was required to include a special comment, such as "prior refusal noted," when she issued a visa to an applicant who had previously applied for a visa and been denied.

135. Although all Consular Officers are required to comply with VLA requirements, Beberman was not given any VLA training at Embassy Caracas until the end of August 2012, but her male and younger female colleagues had been given such training shortly after they arrived at post.

136. From the time that Beberman began work at Embassy Caracas until October 2, 2012, consular management never informed her of any non-conformance with the VLA requirements or any potential VLA violations.

137. On October 1, 2012, the day that Beberman had been scheduled to begin an immigrant visa unit and fraud prevention unit rotation, Cohan did not permit her to begin either rotation or continue adjudicating non-immigrant visas.

138. Cohan treated Beberman differently because of her gender when, on the day that she was scheduled to begin the Immigrant Visa rotation, he did not allow her to do so, but instead

later gave the male consular officer who had the next lower non-immigrant visa refusal rate, the immigrant visa unit and fraud prevention unit rotations that she had been scheduled to perform.

139. Cohan treated Beberman differently when, after observing that Beberman and her male colleague both had low non-immigrant visa refusal rates, he removed both she and her male colleague from adjudicating non-immigrant visas, but then assigned her immigrant visa and fraud prevention unit rotations to her male colleague to advance his career.

140. Even before Cohan disabled Beberman' access to the consular computer systems, Cohan had ended the SharePoint portfolio assignment, which his predecessor had assigned her, notwithstanding her request to continue with that portfolio assignment, telling her that he was against SharePoint and that the consular section should not have a SharePoint site.

141. On information and belief, because he held a discriminatory animus, Cohan later assigned male consular officers to work on the SharePoint site, after having informed Beberman that he was adamantly opposed to SharePoint.

142. After Cohan disabled her access to the consular systems, Cohan did not assign Beberman any work.

143. Beberman asked to assist with taking biometric data and Cohan refused, due to his discriminatory animus, even though he recognized that entering biometric data would not have involved any exercise of discretion.

144. Cohan did not allow Beberman to adjudicate visas or enter biometric data, or give her any new duties for two months, because he had a discriminatory animus and knew that it would be humiliating and demeaning and present the appearance to others in the consular section that she had committed malfeasance or some other impropriety.

145. Cohan demonstrated his discriminatory animus by consistently taking such actions and making comments to demean and humiliate her including:

a. Remarks to her about her engineering background that were demeaning, humiliating, and inappropriate, and intended to belittle her for being a female engineer;

b. Publicly ridiculing her in front of male employees from other federal agencies when she asked to consult with him concerning a non-immigrant visa application before he had disabled her access to the consular computer systems; and

c. Publicly humiliating her in front of the consular section when she asked her fellow consular officers to gather information to share with the Department of Homeland Security (DHS) regarding Venezuelan-European dual citizens who had sought entry under the Visa Waiver Program and who DHS apparently had improperly denied entry, after Cohan had privately approved of her conducting this interagency effort.

146. Cohan's refusal to give her any work after he disabled her access to consular computer systems, for the purpose of further humiliating her, meant that for a substantial portion of the period for which he rated her performance, there was nothing to rate, resulting in an even more negative EER, as a result of his discriminatory animus.

147. Cohan also showed his discriminatory animus by further humiliating and demeaning Beberman by holding a meeting with the consular section at which Beberman was not present and giving pretextual reasons for denying Beberman's access to the consular system computer network.

148. Rumbarger and Cohan deliberately omitted reference to Beberman's role in resolving a sensitive matter in her EER, yet praised a young, African-American, Black male for his role.

149. Beberman served as duty officer when she received a call regarding a sensitive matter.

150. Beberman took all the appropriate steps and obtained information vital to the U.S. response regarding this sensitive matter.

151. Yet neither Rumbarger nor Cohan included any reference to Beberman's handling of this delicate situation in her EER, despite her requesting that they do so.

152. Cohan admitted that Beberman had drafted the following point for him to consider including in the EER:

> During her service as embassy Duty Officer, Julie professionally handled the initial inquiry which alerted U.S. Embassy Caracas of a politically sensitive case involving a U.S. citizen reported missing.

153. Cohan stated that he did not include it because he had "a limited amount of space in the EER form" and because "Ms. Beberman's principal job during the time in question was to adjudicate nonimmigrant visas," "the bulk of her EER details her performance of that task."

154. When it came to the younger, Black, African-American male who took over the case from her, Rumbarger's praise was profuse and even mentioned Beberman's role in taking the initial calls, without referring to her by name.

155. Rumbarger and Cohan deliberately ignored the key role that Beberman played by failing to acknowledge her contribution either at the time that the incident occurred or in her EER, but treated her younger, Black African-male completely differently and more favorably.

156. Based on their discriminatory animus, Cohan and Rumbarger issued Beberman an extremely negative EER.

157. Cohan and Rumbarger discriminated against Beberman by forcing her to leave Embassy Caracas while allowing male and younger female colleagues to complete their assignment at Embassy Caracas.

158. As a result of Cohan and Rumbarger not allowing her to complete her assignment at Embassy Caracas, Beberman's assignment to Embassy Port of Prince, Haiti, which she had been designated to serve after completing her assignment at Embassy Caracas, was cancelled and she was instead assigned to a two-year position in Washington, all of which caused her damages.

159. Cohan demonstrated his discriminatory animus by stating in her EER that Beberman had been curtailed, even though curtailment is an assignment action which is not properly mentioned in an employee's EER.

160. Even though Beberman and the Department agreed on the removal of this reference to curtailment, the shortened period of Beberman's final Embassy Caracas EER demonstrated to the Winter 2015 CTB that Beberman had not completed her Embassy Caracas assignment.

161. Cohan's and Rumbarger's actions were part of a pattern and practice of ongoing discrimination and constituted a violation of Title VII.

162. The discrimination described above was done intentionally, willfully, maliciously, and with a reckless disregard for Beberman's rights under federal law.

163. As a direct and proximate result of said discrimination, the Visa Office found and affirmed that Beberman had committed VLA violations.

164. As a direct and proximate result of said discrimination, the Bureau of Human Resources issued Beberman a one-day suspension

165. The Winter 2015 CTB relied on the extremely negative EER covering the short period from July 26 to November 7, 2012 in denying Beberman tenure.

166. In an Affidavit dated December 18, 2016, the Winter 2015 CTB Chairperson Stephen Schwartz gave the following reason that the Winter 2015 CTB denied Beberman tenure:

> What I recall was an extremely damaging, dangerous, and inexplicable violation of policy and possibly her legal obligations in issuing visas to people who she knew should not have received them. There might have been more but that is the bit I remember.

167. Cohan's and Rumbarger's discriminatory animus, manifested in the negative EER, proximately caused the Winter 2015 CTB to deny Beberman tenure.

168. Tenure denial was an adverse action which caused Beberman to suffer damages detailed below.

## COUNT 3 – DISCRIMINATORY CONDUCT OF THE VISA OFFICE PROXIMATELY CAUSING TENURE DENIAL

169. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

170. David Franz worked in the Visa Office remotely from Embassy Caracas, while Beberman served at Embassy Caracas.

171. Franz conferred regularly with Embassy Caracas consular management including Myers, Cohan, and Rumbarger, and was influenced by them.

172. Franz's wife was then the Deputy Chief of Mission to Embassy Caracas, whose duties include serving as mentor to the entry-level officers including Beberman, and who was also influenced by Myers, Cohan, and Rumbarger in her views about Beberman.

173. Franz provided VLA training at Embassy Caracas, but did not provide it to Beberman until after she had issued the visas that the Visa Office later found to have been issued in violation of the VLA provisions.

174. Franz indicated that he recognized a potential conflict of interest and would not involve himself in the Visa Office's decision-making process involving Beberman.

175. The Visa Office also informed Beberman that Franz would not be involved except for paper processing.

176. Franz was involved in the Visa Office's decision-making process involving Beberman including drafting a memorandum to Human Resources, calling for disciplinary action against her.

177. Franz treated Beberman's matter differently than that of a similarly situated male colleague at another overseas post.

178. Franz found that Beberman's male colleague had issued a visa in violation of the VLA provisions.

179. Franz did not refer Beberman's male colleague's violation for a VLA panel finding and did not refer his matter to Human Resources for a disciplinary action.

180. Franz's own discriminatory animus, and the influence of Cohan, Myers, and Rumbarger, who were motivated by discriminatory animus, caused Franz to treat Beberman's case differently than her similarly situated male colleague.

181. At the time that the Visa Office found Beberman had committed VLA violations, Myers, was assigned to the Visa Office and worked directly for the Chief.

182. Myers' supervisor denied Beberman information she sought to prove that she had not committed VLA violations and served on the panel that found Beberman committed VLA violations.

183. The Visa Office did not fully bar those employees with conflicts, such as Myers and Franz, from influencing the outcome of her case.

184. Myers' discriminatory bias influenced his supervisor and the Visa Office to find that Beberman had committed VLA violations, even though she had not granted a visa to any aliens ineligible for a visa.

185. The Visa Office further demonstrated that it was biased against Beberman by issuing VLA Panel findings without responding to her justifications for the issuances and by the Managing Director's failure to adequately review the VLA Panel's findings on appeal, rather than just rubberstamping them.

186. The Visa Office's discriminatory animus proximately caused the Bureau of Human Resources to issue a one-day disciplinary suspension.

187. The Visa Office's discriminatory animus toward Beberman resulted in its issuing and confirming on appeal VLA violations, which were then referred to in her EER, proximately causing the Winter 2015 CTB to deny her tenure.

188. Such tenure denial caused her damages detailed below.

**COUNT 4 – RETALIATORY CONDUCT OF THE OFFICE OF CIVIL RIGHTS PROXIMATELY CAUSING TENURE DENIAL**

189. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

190. AF chose Beberman to serve as an EEO Counselor on April 10, 2013.

191. She fulfilled the prerequisites to serve as an EEO Counselor, including a week-long training session, and OCR informed her that she was certified as an EEO Counselor on June 19, 2013.

192. On November 6, 2013, she was assigned her first EEO case to counsel.

193. As an EEO Counselor, Beberman's duties in accordance with 29 C.F.R. § 1614 and Management Directive 110 were as follows:

1. Advise individuals about the EEO complaint process, including the Alternative Dispute Resolution (ADR) program;

2. Gather information about the complaint;

3. Define the claim/s and basis/es of the complaint;

4. Conduct a limited inquiry;

5. Attempt resolution of the complaint at the lowest level possible;

6. Conclude the counseling process if resolution is not achieved and issue the "Notice of the Right to File a Discrimination Complaint"

7. Memorialize EEO counseling activities in an EEO Counselor's Report

194. In the course of performing her duties as an EEO Counselor, she told a Responsible Management Official (RMO) that she had previously prevailed in an EEO matter.

195. On or about the week of June 9, 2014, Glenn Budd, OCR's Chief of Intake and Resolution called Beberman without advance notice. Wendy Herring, who worked with Budd, joined the call.

196. Budd asked Beberman whether she had disclosed her prior EEO activity to the RMO and Beberman answered affirmatively.

197. Budd accused Beberman of being biased against the State Department and told her that he would be sending her a letter terminating her as an EEO Counselor.

198. On June 24, 2014, Budd wrote Beberman the following letter:

> Dear Julie Beberman,
>
> The Office of Civil Rights would like to thank you for your work as an EEO Counselor. This is a challenging yet vital role within the Department. However, we regret to inform you that we no longer require your services at this time and must immediately remove you from the EEO Counselor Program.
>
> We appreciate all you have done for the Department and are grateful for your assistance and willingness to conduct EEO counseling on behalf of the Office of Civil Rights.
> If you have any questions, please do not hesitate to contact us.
>
> Sincerely,

Glenn C. Budd
Chief, Intake and Resolution

199. At the time that OCR terminated Beberman, it was aware of Beberman's extensive prior EEO activity.

200. Beberman was performing her duties as an EEO Counselor in a neutral manner.

201. Budd terminated Beberman's collateral duty as EEO Counselor in retaliation for her engaging in protected EEO activity.

202. But for her prior EEO activity, OCR would not have terminated Beberman as a collateral duty EEO Counselor.

203. Beberman's termination as a collateral duty EEO Counselor constitutes an adverse action.

204. Retaliatory termination as an EEO Counselor would deter a reasonable employee from engaging in protected EEO activity.

205. FSOs are evaluated on their support of EEO principles.

206. In Beberman's evaluations when she served as an EEO Counselor, her superiors praised her for her role as an EEO Counselor.

207. By removing Beberman's collateral duty as an EEO Counselor, OCR harmed her by eliminating this beneficial consideration from her future evaluations.

208. The Department currently requires EEO Counselors to agree to serve for a minimum of four years.

209. Beberman was expected to serve as EEO Counselor in her onward assignment in Embassy Malabo, Equatorial Guinea, beginning December 2014. Embassy Malabo's Deputy Chief of Mission expressed to Beberman that she was displeased that Beberman could not serve as EEO Counselor.

210. Beberman's termination as EEO Counselor caused her Embassy Malabo superiors to be concerned about her performance in advance of her even reporting to duty.

211. The Secretary retaliated against Beberman for engaging in Title VII and ADEA protected activities.

212. Evidence of the Secretary's retaliatory animus includes OCR sending a Report of Investigation (ROI) to Beberman's former address and failing to take steps to correct this error when Beberman discovered it. OCR showed its retaliatory animus by refusing to correct this error even though it recognized that the issuance of the ROI triggered certain time-sensitive rights and that Beberman could not exercise those rights because she had not received the ROI, due to OCR's error.

213. Further evidence of the Secretary's retaliatory animus includes OCR's repeated deliberate failure to provide Beberman an opportunity to resolve her concerns at the informal stage, leaving her only the option of filing a formal complaint, contrary to the rules and procedures applying to federal employees.

214. The Secretary's retaliation chilled Beberman's right to freely participate in and speak about her Title VII and ADEA protected activities.

215. The Secretary's retaliation also chilled the rights of other employees who were afraid that they could be persecuted or face reprisal for engaging in or speaking about their Title VII or ADEA protected activities or testifying with regard to Beberman's claims.

216. The Secretary's retaliation has a particularly strong chilling effect because OCR, itself, retaliated against Beberman, notwithstanding its mandate is to uphold civil rights and investigate civil rights violations.

217. OCR, in the conduct of its own operations, serves as a model which the rest of the State Department follows.

218. On January 1, 2014, OCR requested that the EEO Counselors, including Beberman, provide the names of their supervisor so that the OCR Director could recognize their service with a message of appreciation to their supervisors.

219. After Beberman's termination as an EEO Counselor, Beberman's supervisors did not receive any such letters of appreciation from the OCR Director, acknowledging her service as an EEO Counselor, which would have tended to influence them to write an even more positive EER.

220. Once Beberman was terminated as an EEO Counselor, her raters and reviewers could no longer make reference to this collateral duty in her performance evaluations.

221. After her termination as an EEO Counselor, not only did Beberman's EERs not reflect her performance as an EEO Counselor, but the change to her duties permitted the CTB to draw an adverse inference about this change in her duties, which caused her harm.

222. The lack of opportunity to reference Beberman's performance as an EEO Counselor in her performance evaluations contributed to and proximately caused the Summer and Winter 2015 CTBs, respectively, to defer and deny Beberman tenure.

223. The retaliation described above was done intentionally, willfully, maliciously, and with a reckless disregard for Beberman's rights under federal law.

224. Such tenure denial caused Beberman damages detailed below.

## COUNT 5 – RETALIATORY AND DISCRIMINATORY DENIAL OF OPPORTUNITY TO SERVE AS BACKUP CONSULAR OFFICER PROXIMATELY CAUSING TENURE DENIAL

225. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

226. Beberman was selected through the competitive bidding process to serve as Politcal/Economic Officer with backup consular responsibilities in Malabo, Equatorial Guinea.

227. Beberman engaged in mediation with the State Department of several pending EEO complaints including a complaint alleging a Title VII violation.

228. Beberman rejected the offers that the State Department made during the mediation.

229. The State Department's mediation representative, then Deputy Assistant Secretary Marcia Bernicat, held a retaliatory animus, including as a result of Beberman previously accusing her of having a conflict of interest and of not having conducting an independent review before issuing a disciplinary action, as well as because Beberman rejected her settlement offer.

230. Subsequent to Beberman claiming Bernicat had a conflict of interest and that she should have recused from acting as decision maker, the Office of the Inspector General found that the Department's Disciplinary Procedures lacked a conflict of interest provision and recommended that a standard recusal process be instituted, which further incensed Bernicat toward Beberman.

231. Bernicat was aware of Beberman's claims regarding her conduct as well as her prior EEO activity before mediation began, but nonetheless decided to serve as the State Department's mediation representative.

232. Because Beberman refused to accept the State Department's settlement offer, which Bernicat conveyed to her, to retaliate against Beberman, Bernicat communicated to the AF Principal Deputy Assistant Secretary information about Beberman's past service as a consular officer, knowing that if she had not done so, Beberman would have been allowed to serve as backup- consular officer as assigned.

233. The Principal Deputy Assistant Secretary then communicated with the Bureau of Consular Affairs.

234. After and as a result of the Principal Deputy Assistant Secretary's communication, the Bureau of Consular Affairs decided to deny Beberman the opportunity to serve as backup consular officer at Embassy Malabo.

235. The Bureau of Consular Affairs was also influenced by Cohan, Myers,' Rumbarger's and Franz's discriminatory animus and actions.

236. Beberman's first rater and reviewer at Embassy Malabo, Deputy Chief of Mission Joyce Namde, and Ambassador Mark Asquino, respectively were surprised and displeased that she would not be allowed to serve as backup consular officer.

237. The State Department first communicated to Beberman the decision to deny her the opportunity to serve as backup consular officer at Embassy Malabo, contrary to the terms of her assignment, after she had rented out her house and left Washington, when she reported to duty at Embassy Malabo on December 22, 2014, and therefore, had little or no immediate recourse.

238. Bernicat's retaliatory conduct chilled Beberman's right to freely participate in her Title VII activities, including mediation.

239. Bernicat's retaliatory conduct also chilled the rights of other employees who were afraid that they could be persecuted or face reprisal for engaging in Title VII activities or testifying with regard to Beberman's claims.

240. Bernicat's retaliatory conduct had a particularly strong chilling effect because she was a high-level official in the Bureau of Human Resources and acting as the State Department's representative, when she retaliated against Beberman, and therefore, would have been expected to conduct herself with the highest level of integrity and in conformance with all rules and mores pertaining to protecting EEO activities.

241. Because Beberman was not permitted to serve as backup consular officer at Embassy Malabo, none of her EERs or Memoranda of Performance evaluated her on her performance as a backup consular officer and the only EERs which evaluated her on her consular performance were those from Embassy Caracas.

242. The Winter 2015 CTB denied Beberman tenure because there was no EER subsequent to her service at Embassy Caracas evaluating Beberman on her performance of her consular work, because she was not permitted to perform consular work at Embassy Malabo.

243. The retaliatory and discriminatory change to Beberman's Embassy Malabo assignment, removing her consular duties, proximately caused the Winter 2015 CTB to deny Beberman tenure.

244. This lack of opportunity to have an EER which positively evaluated her service as a consular officer proximately caused the Winter 2015 CTB to deny Beberman tenure.

245. Such tenure denial caused her damages detailed below.

## COUNT 6 – RETALIATORY AND DISCRIMINATORY TRANSFER DUE TO AMBASSADOR FURUTA-TOY'S CONDUCT

246. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

247. Before Ambassador Julie Furuta-Toy departed Washington to serve as the U.S. Ambassador to Equatorial Guinea, the Bureau of Consular Affairs briefed her about Beberman.

248. Consular Affairs briefing was influenced by Embassy Caracas consular management's and the Visa Office's discriminatory animus.

249. Because Consular Affairs had caused Ambassador Furuta-Toy to form a negative view of Beberman, at her first meeting with Beberman after Ambassador Furuta-Toy arrived at Embassy Malabo, Ambassador Furuta-Toy told Beberman that she did not intend to request that Beberman remain at post if she were denied tenure.

250. Beberman's limited career appointment expired on March 27, 2016, without her being tenured.

251. The Foreign Service Grievance Board granted Beberman interim relief from separation pursuant to 22 U.S.C. § 4136(8).

252. Beberman asked Ambassador Furuta-Toy to request that she be allowed to complete her Embassy Malabo assignment while her grievance was pending.

253. Ambassador Furuta-Toy declined to make the request in retaliation against Beberman because Beberman had engaged in EEO activities and had matters pending and because of the biased briefing that Consular Affairs had given her about Beberman.

254. Beberman's EEO activities included her request for an administrative hearing on Title VII claims.

255. Because Ambassador Furuta-Toy refused Beberman's request, Beberman was issued Separation Orders and required to leave her overseas assignment to work in Washington, D.C.

256. The adverse action of being required to leave her overseas assignment to work in Washington caused Beberman to suffer damages detailed below.

## COUNT 7 – RETALIATORY AND DISCRIMINATORY TRANSFER

257. Beberman realleges each and every allegation contained in the previous paragraphs as if fully contained herein.

258. A known male Foreign Service officer's limited career appointment expired on March 27, 2016, without him being tenured and the Foreign Service Grievance Board also granted him interim relief.

259. The male Foreign Service Officer had not engaged in any activity protected under Title VII.

260. The male Foreign Service officer remained in his overseas assignment until he completed it, received a regular Permanent Change of Station Order, and was immediately assigned to a Washington D.C. assignment upon the completion of his overseas assignment.

261. According to Beberman's Career Development Officer, during the same general timeframe, another male Foreign Service officer was also allowed to remain at his overseas post while on interim relief after he was denied tenure.

262. Beberman was treated differently and far less favorably than these similarly situated male Foreign Service Officers, because she is female.

263. Beberman was treated differently and less favorably than her similarly situated male colleague in retaliation for having engaged in Title VII activities.

264. Beberman was required to leave Embassy Malabo, was initially issued a Separation Order rather than a PCS Order, and was not initially given an assignment in retaliation for engaging in Title VII activities and due to discrimination against her as a woman.

265. This adverse action caused Beberman damages further detailed below.

**COUNT 8 – DISCRIMINATORY TRANSFER**

266. Beberman, an entry-level Foreign Service Officer, was serving a three-year tour as the Political/Economic Officer with Commercial Affairs responsibilities at U.S. Embassy, Malabo, Equatorial Guinea.

267. Beberman's assignment was scheduled to end in January 2018.

268. Beberman was denied tenure in February 2016.

269. Ambassador Julie Furuta-Toy could have asked for Beberman to remain at post by completing a simple template request form.

270. Ambassador Furuta-Toy declined to do so, even though Beberman was performing well at Embassy Malabo, and had all favorable reviews since November 2012.

271. As a result, Beberman was ordered to leave Embassy Malabo where she had served as the Political/Economic Officer with Commercial Affairs responsibilities.

272. She departed Embassy Malabo in early April 2016.

273. Beberman learned on September 18, 2018, the reasons that Ambassador Furuta-Toy and Deputy Chief of Mission (DCM) Petra Zabriskie placed Matthew Lamm in her position as Political/Economic Officer with Commercial Affairs responsibilities.

274. Matthew Lamm is a younger male Foreign Service Officer of Native American descent.

275. Matthew Lamm is coned as a political officer, but had been serving as a Public

Diplomacy Officer at Embassy Malabo.

276. Ambassador Julie Futura-Toy and Deputy Chief of Mission (DCM) Petra Zabriskie did not want Beberman to remain at post because they wanted to give Lamm an opportunity to serve in a position which included political officer responsibilities, rather than continue his previously assigned position as Malabo's Public Diplomacy officer.

277. Ambassador Furuta-Toy and DCM Zabriskie wanted Lamm to fill Beberman's position because it would make it more likely that he would be promoted and it would advance his career.

278. Ambassador Furuta-Toy and DCM Zabriskie were more concerned about Lamm's career because he was a Native American man than with Beberman's career because she was a Caucasian woman.

279. Furthermore, Ambassador Furuta-Toy and DCM Zabriskie were not aware that Lamm had filed any EEO complaints.

280. According to Ambassador Furuta-Toy and DCM Zabriskie, they selected Lamm to fill Beberman's position even before Beberman had left post.

281. Ambassador Furuta-Toy and DCM Zabriskie deliberately kept the fact that Lamm would be replacing her from Beberman.

282. Although Beberman's position was placed on the bid list, Ambassador Furuta-Toy and DCM Zabriskie were just going through the motions, because they had already pre-selected Lamm.

283. Ambassador Futura-Toy and the DCM Zabriskie, referred to Lamm as the Political Section Chief and the Political/Economic Officer, but referred to Beberman as only a Political Officer, even though they held the exact same position, which also shows their

bias in favor of Lamm and against Beberman.

284. Ambassador Furuta-Toy was motivated by discriminatory animus based on Beberman's gender and race as compared to Lamm's gender and race, not to request that she remain at Embassy Malabo after she was denied tenure.

285. This adverse action caused Beberman to suffered damages as further detailed

## DAMAGES

286. When Beberman served at Embassy Caracas she received hardship pay and housing. She also earned Home Leave days. Curtailing Beberman and sending Beberman to Washington caused her to lose these benefits.

287. Beberman was scheduled to attend some language training and report to duty at Embassy Port-Au-Prince, Haiti, where she would have received hardship pay, housing, and have earned more Home Leave days. Because Beberman's Embassy Caracas assignment was curtailed, her Embassy Port-Au-Prince assignment was cancelled. She lost the opportunity to attend language training and did not receive the benefits that she would have received had she been in Port-Au-Prince instead of Washington.

288. When Beberman was denied tenure, she was in the middle of an assignment as Political/Economic Officer with Commercial Affairs responsibilities, in charge of the Political-Economic section at Embassy Malabo.

289. Having to return to Washington disrupted Beberman's career as a Foreign Service officer. She was no longer allowed to perform the duties she had trained for extensively, prepared for by engaging with host government officials at the Africa Leaders Summit, had been performing successfully for a year and four months, and thoroughly enjoyed. She was performing in a mid-level position as an entry-level officer, which was giving her excellent

experience that would have allowed her to advance in her career. She was working as a front-line diplomat, which is completely different than working in Washington.

290. It also disrupted Beberman's social life to have to abruptly depart Equatorial Guinea. As Embassy Malabo management has repeatedly noted, Beberman had built strong relationships while posted in Malabo, with her Embassy Malabo colleagues, the diplomatic community, civil society representatives, host government officials, and other Ecuatoguineans.

291. Beberman suffered and continues to suffer anxiety, emotional distress, sadness, loss of sleep, teeth grinding and weight gain caused by this disruption of both her work and social life.

292. Beberman bid for and was selected to serve at Embassy Malabo in part because Embassy Malabo was a hardship post which would entitle her to participate in the Student Loan Repayment Program.

293. While Beberman worked at Embassy Malabo, she received hardship pay, service needs differential, entitlement to participate in the Student Loan Repayment Program, which she did, and housing, she earned Home Leave, and was entitled to R&R travel benefits.

294. When she was required to transfer to Washington, she lost these benefits.

295. When Beberman was first transferred to Washington, she was not allowed a transit subsidy and, therefore, incurred transit costs for which she was not compensated.

296. When Beberman was first transferred to Washington, she was not allowed access to her household effects, which caused her great inconvenience and hardship, and resulted in her selling her home, since she had nothing with which to furnish it.

297. When Beberman was first transferred to Washington, she was not given a Home Service Transfer Allowance or locality pay, which caused her inconvenience and stress.

298. Because Beberman had no indication of how long she would be staying in its employ, and therefore needed to remain flexible, she did not take delivery of her unaccompanied air baggage and therefore did not have access to her belongings and had to pay for storage.

299. Because Beberman was denied tenure, she was not eligible for promotion and was not promoted.

300. Even if Beberman's Caracas EERs are removed from her personnel file, the subsequent EERs that did not refer to her service as a backup consular officer or as an EEO Counselor will continue to harm Beberman in that they will decrease the likelihood of her being granted tenure and promotion.

301. The results of the Summer and Winter 2015 CTBs were published within the State Department and Beberman's co-workers are aware that she was denied tenure, which is highly embarrassing for her.

302. As a direct and proximate result of such discrimination and retaliation, Beberman has suffered and continues to suffer mental anguish, distress, humiliation, great expense, and loss of enjoyment of life.

## JURY DEMAND

Plaintiff Julie Beberman requests that a jury be convened to try all factual issues that may be determined by a jury in this case.

## PRAYER FOR RELIEF

Plaintiff Julie Beberman prays that this Court grant her relief as follows:

As remedies, Beberman asks that this Court grant

(a) her return to Embassy Malabo to complete her assignment;

(b) backpay, including the hardship, service needs differentials, Student Loan Repayment Program, R&R travel benefits, and Home Leave she would have been entitled to, if she had been allowed to complete her assignments at Embassy Caracas and Embassy Malabo and been allowed to serve at Embassy Port-Au-Prince;

(c) front pay of these same benefits until her Embassy Malabo would have ended;

(d) reimbursement of transit expenses and compensation for her lack of access to her household effects from April to November 2016, including per diem;

~~(e) retroactive tenure and promotion;~~

(f) if not retroactive tenure and promotion, direction that the State Department immediately remove Beberman's EER covering the periods from October 3, 2011 to November 7, 2012, from Beberman' personnel file and reconstitute a Commissioning and Tenure Board to consider her for tenure retroactively and a promotion board to consider her for promotion retroactively..

(g) if not (e) or (f), extension of Beberman's limited career appointment to have further evaluated experience upon which a CTB can make its decision, since she was not evaluated on her backup consular performance or EEO counselor performance after she was terminated as EEO Counselor, and two of her assignment were cut short; and

(h) compensatory damages for emotional distress and other damages caused by discriminatory and retaliatory conduct;

(i) attorney's fees and costs, as warranted; and

(j) such other and further relief as the law allows.

Respectfully submitted,

July 23, 2019

Julie A. Beberman, pro se
P.O. Box 7006
Arlington, VA 22207
bebermanja@state.gov
oilgenie@yahoo.com
(340) 277-1613

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of July 2019, the foregoing Plaintiff's Third Amended Complaint was served on Defendant via electronic mail and U.S. mail to Mark Nebeker at

W. Mark Nebeker
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC 20530
(202) 252-2536
mark.nebeker@usdoj.gov.

Dated: July 23, 2019

/s Julie Beberman
Julie A. Beberman, pro se
P.O. Box 7006
Arlington, VA 22207
(340) 277-1613
BebermanJA@state.gov
OilGenie@yahoo.com

NTEED*

★ ★

CKED

★ ★

URED

★

PRESS FIRMLY TO SEAL

10

FOR DOMESTIC AND

PLACE MAILI

WRITE FIRMLY TO MAKE ALL COPIES LEGIBLE.

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT) PHONE (340) 777-1613

JULIE KEBERMAN
PO BOX 7006
ARLINGTON VA
22207

**PAYMENT BY ACCOUNT (if applicable)**

**DELIVERY OPTIONS (Customer Use Only)**

☐ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the address mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**

- ☐ No Saturday Delivery (delivered next business day)
- ☐ Sunday/Holiday Delivery Required (additional fee, where available*)
- ☐ 10:30 AM Delivery Required (additional fee, where available*)

*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT) PHONE ( )

US DISTRICT CT Rm 1225
333 Constitution Ave NW
WASH, DC 20001

ZIP + 4® (U.S. ADDRESSES ONLY)

2 0 0 0 1 - _ _ _ _

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 Insurance Included.

LE.

RE

PRI

ATES
RVICE®

VISIT US AT
ORDER FREE SUP

3

UNITED STATES POSTAL SERVICE
1007

20001

U.S. POSTAGE PAID
PME 1-Day
WORCESTER, MA
01613
JUL 24, 19
AMOUNT
**$35.25**
R2305E126149-24

**INTERNATIONAL USE**
**IG LABEL HERE**

EK634705840US

**UNITED STATES POSTAL SERVICE®** | **PRIORITY ★ MAIL ★ EXPRESS™**

**ORIGIN (POSTAL SERVICE USE ONLY)**

☐ 1-Day ☐ 2-Day ☐ Military ☐ DPO

| | | | |
|---|---|---|---|
| PO ZIP Code: 01613 | Scheduled Delivery Date (MM/DD/YY): 07/25/19 | Postage: $ 35.25 | |
| Date Accepted (MM/DD/YY): 07/23/19 | Scheduled Delivery Time: ☐ 10:30 AM ☐ 3:00 PM ☐ 12 NOON | Insurance Fee: $ | COD Fee: $ |
| Time Accepted: 11:07 ☑ AM ☐ PM | 10:30 AM Delivery Fee: $ | Return Receipt Fee: $ | Live Animal Transportation Fee: $ |
| Weight: ☐ Flat Rate; 1 lbs. 10 ozs. | Sunday/Holiday Premium Fee: $ | Total Postage & Fees: $ 35.25 | |
| | Acceptance Employee Initials: | | |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |

LABEL 11-B, JANUARY 2014 PSN 7690-02-000-9996 3-ADDRESSEE COPY

JSPS.COM®
'PLIES ONLINE

UNITED STATES POSTAL SERVICE

Please Recycle

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express™ shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP13C © U.S. Postal Service; July 2013; All rights reserved.

DuPont™ Tyvek® Protect What's Inside.™